Buchanan et al. v. Harvey et al.

JOSEPH S. BUCHANAN *et al.*, Appellants, *v.* ADELINE HARVEY *et al.*, Respondents.

*Husband and wife—Lawful Issue.*—By the statute of this State, the issue of a marriage deemed null in law are legitimate.

*Appeal from St. Louis Circuit Court.*

*P. C. Morehead,* for appellants.

It has been insisted from the beginning by the defendants in error, that the case of Johnson v. Johnson's administrator, 30 Mo. 72, determines this case in accordance with the judgments of the courts below. Col. Johnson had but one wife in the Indian country, a daughter of the Indian chief "Keokuk." In this case, the defendants in error assume that A. W. Harvey was married to two Indian women at the same time, of the Blackfeet tribe, under the customs of that tribe, and had one daughter by each of them—the wards of the defendants in error.

It may be conceded on the proof that he cohabited with two Indian women at the same time, of that tribe, some years after 1833, and had a daughter by each one of them. It does not appear when this cohabitation commenced after 1833, at what locality, or whether that tribe had a settled habitation. At page 85 in said case, it is conceded by the court that the instruction of the Land Court is sustained by writers on marriage. "But cohabitation by consent for an indefinite period of time, for the procreation and bringing up of children, *that* in a state of nature would be a marriage."

The principle is not resisted; but if he had cohabited with two Indian women at the same time, as in this case, that would have been inconsistent with the law of nature, either in a moral or christian sense. The conclusion of the court had no reference to polygamy. The case cited in Tennessee (5 Humph. 13) had relation only to a man and wife "to live together as man and wife."

It is a settled principle in England, that no law is valid

that is not founded on reason. "Upon the law of nature and the law of Revelation, depend all human laws." The western Indian tribes are not regarded as nations, but are held amenable to the laws of the United States. Their indomitable aversion to civilization precludes the idea of law among them; they have no power to make laws; and if they have no laws they can have no valid customs. Although treaties are made with them, it is upon the principal of political sympathy. The Blackfeet tribe, especially, are a migratory people, without local habitation, receding with the buffalo as civilization approaches. We are not assured by any evidence that these asserted customs exist among themselves, but merely with traders; we are not assured by any evidence that there is such an excess of females among them as to justify the possibility of such customs among themselves. Can these customs be traced back to a period of time beyond the reach of memory? One of the witnesses stated "they were such at that time, 1831."

The question of permanency, as discussed by the court at page 86, has no bearing in this case. Page 88, the court says: "It is well settled as a general proposition, that a marriage valid according to the law or custom where it is contracted, is valid everywhere." This principle is well established; but the question is, was there a marriage at all? of which we will say more further on. A marriage in England and valid there, is valid here; but what is called a marriage in Turkey, where a plurality of wives is allowed, is not valid here, because inconsistent with nature and christianity. How could we regulate the law of descents and dower in such a state of case?

As to polygamy, see Sto. Confl. L. §§ 113–14; 1 Black. Comm. 436; 9 Bligh, 112; Bishop, Mar. & D. 201, 89. As to the law of Missouri, "that the issue of all marriages deemed null in law shall be legitimate." It is upon this question, doubtless, that the defendants in error hope to maintain their proposition. The court says: "Under our laws, upon an issue of legitimacy the issue is limited to the

mere fact of actual marriage, and upon this investigation, confining ourselves to the rules of evidence established before this significant change in the law, the jury are bound to make every intendment in favor of the legitimacy of the children not necessarily excluded by the proof." The meaning of this law and of an actual marriage are now necessary inquiries. If the whole clause of the statute is taken together, it may somewhat explain the meaning of the Legislature: " Where a man having by a woman (not women) one or more children, shall afterwards intermarry with such woman, such child or children, if recognized by him, shall be thereby legitimated, and the issue of all marriages deemed null in law shall be nevertheless legitimate."

The cases referred to by the court, 1 Penrose & W. 452, and 1 Harris & McH. 152, had no reference to polygamy, or to what is termed Indian customs. The Legislature did not mean any such thing as polygamy; they could not, because that was expressly prohibited by statutory penalties repeatedly carried into effect in this State in cases of bigamy. There may be acts of parties which in common parlance may be called marriages, so absurd in themselves as to negative the right to that appellation.

But can there be any such thing as a marriage null in law? The word itself implies legality—either natural or civil law; without the sanction of law, it can have no existence. It is one of the earliest institutions on earth, and has been held, through all the mutations of society, unchanged in its true signification. There is no word in language so truly defined. " For this cause shall a man leave his father and mother, and shall be joined unto his wife, and they two shall be one flesh." (Genesis, ch. 2, v. 24; Matthew, ch. 9, v. 5; Mark, ch. 10, v. 7.) " To avoid fornication, let every man have his own wife, and every wife her own husband." (1 Cor. 7: 2.) " Marriage was instituted by God himself to prevent the promiscuous intercourse of the sexes, for promoting domestic felicity." (Web. Dic.) " In law, marriage is the conjugal union of one man with one woman." (New Am. Cyc.)

(See Bishop on Mar. & D. §§ 29 & 45.) It has its relative incidents, morally and civilly. In municipal law, legitimacy of children, transmission of property, inheritance and dower. These are as essential to the perfection of marriage, as the arteries of the heart to spiritual life. If Harvey was really married to the five women the witnesses speak of, or even two, how can the inheritance and dower be disposed of? The asserted marriage to the last two women was simultaneous—no priority of time.

*Hill & Jewett,* for defendants in error.

The respondents rely fully upon the case of Johnson v. Johnson's Adm'r, 30 Mo. 72. In the case at bar, the marriage is much more fully proved than in the case cited, and the parties continued to live together in that relation till the death of Harvey. The only distinction between the case at bar and the case cited is, that in this case the deceased had two wives and a child by each, and in Johnson's case there was but one wife.

But it is a distinction without a difference in principle. The point decided by the case of Johnson is, that a marriage valid by the custom of the Indian tribe where it was made, and where the parties continued to live together, will be recognized as valid in this State; and especially so far as the children and their rights are concerned under the statutes of this State, it is only necessary to show a marriage in fact, whether legal or not, and that continued cohabitation as man and wife is sufficient to establish the fact of marriage. In this case we fully prove the fact and the law or custom of the tribe, and that polygamy is as lawful among that tribe of Indians as monogamy; and, in fact, the authority of Schoolcraft, as quoted by the court in the case of Johnson, shows that polygamy is the common practice of the Indian tribes, and that the children are all recognized as of the family. The court say, in the case of Johnson, " that, under our law, upon an issue of legitimacy the inquiry is limited to the mere fact of actual marriage, and that upon this investiga-

tion the jury are bound to make every intendment in favor of the legitimacy of the children, not necessarily excluded by the proof."

In vol. 14, American Jurist, p. 275, is an article upon the case of a Turk who had three wives, and to whom he was lawfully married according to the laws of his own country, and three sons, one by each wife, born in his own country. He then came to Philadelphia with his three wives and three sons and died, leaving real property in Pennsylvania to a large amount. The question was, would the real property go to the children equally as his legitimate heirs? and the writer decides without hesitation that the children are his legitimate heirs, and would take the property, share and share alike, as such..

We think there is no difference in principle between the case at bar and that of Johnson, and that the judgment of the court below must be affirmed, unless the well settled law upon this subject is overturned.

BATES, Judge, delivered the opinion of the court.

Alexander M. Harvey, who had resided for many years in the Indian country, died in that country on the Missouri river, near the mouth of the Yellowstone, in 1854. For many years before his death, and up to the time of his death, he had two wives, who were sisters, and of the Blackfeet tribe of Indians. They were both considered and treated by him as his lawful wives, and he had by each one of them a daughter. These daughters, Susan and Adeline, who were of about the same age, he brought to St. Louis, when they were four or five years old, and confided them to his brother, who lived at St. Louis, to be by him reared and educated. He always treated them and spoke of them as his legitimate children, and stated his intention to educate them and bequeath to them his estate; and when he was taken ill and expected soon to die, he attempted to execute a will in their favor, but the instrument could not be established as a will because it was not executed in proper form.

The evidence in regard to his relation to his two wives

does not show when that relation began, but does show him to have lived with them as his wives in conformity to the customs of the Blackfeet Indians, among whom polygamy was lawful. The testimony is, that "among the Blackfeet Indians a man might have several wives, who were considered his lawful wives according to the Indian custom; and the usual custom was to buy the oldest marriageable daughter of a family, and that the younger ones, as they grew up, became his, in right of having purchased the oldest."

In this case, Harvey had stated to friends that the women were his lawful wives according to the customs of the Blackfeet Indians, Peegan band. He said that he bought them according to the customs of the country, and gave a running horse and other things for them.

After his death, his estate was administered at St. Louis, and at the close of the administration the St. Louis probate court ordered the estate to be distributed to the said two daughters of Harvey, Susan and Adeline. From this judgment of the probate court, Buchanan, a half-brother of Harvey, and so claiming to be an heir at law, upon the allegation of the illegitimacy of the children, Susan and Adeline, appealed to the Circuit Court. That court affirmed the judgment of the probate court, and Buchanan appealed to this court.

Upon the principles stated by this court in the case of Johnson v. Johnson's Adm'r, 30 Mo. 72, the validity of the marriages of Harvey with the two women could probably be maintained; but our statute, declaring the issue of all marriages deemed null in law to be legitimate, precludes the necessity of that inquiry. It is clear that marriage in fact existed with both of the Indian women; Harvey's connection with them was not a mere casual commerce between the sexes, but there was a cohabitation by consent, for an indefinite period of time, for the procreation of children. There being marriage in fact with the mother of each of the children, the statute legitimates them both.

Judgment affirmed. Judges Bay and Dryden concur.