## ADDIE NELSON and DAVE NELSON v. TALITHA JONES, LIZZIE C. CHISM et al., Appellants.

In Banc, November 14, 1912.

1. **SUIT TO QUIET TITLE: When in Equity.** Suits to determine and decree title are viewed as of equitable cognizance unless the issues are so framed by the pleadings as to make the proceeding an action at law.

2. ————: **Estoppel: Abandoned.** The plaintiff and the three defendants, while they were all minors, as coplaintiffs brought suit against a third party to determine the respective interests of the plaintiffs and said third party in the land, and the decree was that "the plaintiffs are the owners of the property and defendant has no interest therein." The suit in this case is by one of those plaintiffs against the other three, and defendants pleaded in their answer that by the procurement and acquiescence of plaintiff they were put to such trouble, outlays, and expenses in and about that proceeding as raises an estoppel against plaintiffs' claim to be sole owner, and plaintiff by reply pleaded her minority as avoiding the estoppel. There was no plea of *res adjudicata.* An objection to testimony offered to sustain the plea of estoppel was sustained, and defendants' counsel do not predicate error upon that ruling, but treat the whole matter as of little or no appellate value. *Held,* that the issue of estoppel is out of the case.

3. ————: **Question of Legitimacy of Innocent Children.** Where the right of defendants to share in the land depends upon the existence of a divorce in favor of their deceased father prior to his marriage to their mother, the presence of blameless and innocent children and of a situation made sordid and squalid by ignorance and poverty, bespeaks judicial charity and mercy to the very verge of the law, in order that a just result may be worked out. A child will not be held to be a bastard unless there is no escape from that dire conclusion.

4. ————: ————: **Marriage: Divorce: Remarriage: Presumptions.** When a status is once established it is presumed to continue until the contrary is made manifest by proof. Where a marriage is once shown, the presumption is that its status continues until he who asserts the contrary establishes its discontinuance by divorce, etc. But there are two exceptions to that presumption, namely: in favor of life, liberty and innocence all things are to be presumed; and, second, a wrong is never to be presumed. The law presumes innocence, not guilt; morality, not immorality; marriage, not concubinage; legitimacy, not bastardy. Accordingly, when the presumption that marriage

once established continues to exist is confronted, under proper proof, by presumptions in favor of innocence rather than crime, in favor of morality instead of vice, the former presumption gives way and the latter obtains. So that if Emma and John were married, and afterwards John and Lizzie by virtue of a common law or ceremonial marriage consorted together as husband and wife during Emma's life, and held themselves out and were recognized as such, in the community and by their kinsfolk, the burden of proof that John and Emma were not divorced (and that consequently the relations between John and Lizzie were meretricious and criminal) is upon the child of John and Emma in a controversy with the children of John and Lizzie over land belonging to John at the time of his death, though it is a negative fact and hard to prove.

5. ————: **Divorce: Proof: Negative: Hearsay.** Testimony of two or three witnesses living in the community where the parties lived to the effect that they never heard any one speak of a divorce, is not the cogent proof required by the. law to overcome the strong presumption of innocence.

6. ————: ————: ————: ————: **Examination of Records.** The law does not require a production of certified copies of all the records of the county where the parties resided in order to establish the negative fact that there was no divorce. It may be established by the parol evidence of a qualified person who has diligently examined them. But where those records are in another State the examination should be made by their custodian or one qualified by familiarity with them.

7. **LEGITIMATE CHILDREN: No Divorce Shown: First Wife. Living.** Accepting the view that the word "decreed" used in the statute declaring that "the issue of all marriages decreed null in law, or dissolved by divorce, shall be legitimate" is not materially different in meaning from the word "deemed" for which it was substituted in 1865, as was held in Green v. Green, 126 Mo. 17, it is held that the children born during the life of Emma of John and Lizzie, who lived and were recognized as husband and wife in the community in which John and Emma formerly lived and were married, both of whom are now dead, were legitimate children of John, without any showing of a divorce dissolving the marital relation between John and Emma.

8. ————: ————: ————: **Good Faith of Second Wife.** In considering the legitimacy of the children regard should be had to the good faith of their mother, who, ignorant, immature and in the midst of a lowly and primitive environment, while John's former wife was alive, eloped with him, and for five or six years thereafter, fearlessly and openly among her neighbors and acquaintances, filled the office of wife and mother with the man she then took as her husband.

Appeal from Pemiscot Circuit Court.—*Hon. Henry C. Riley,* Judge.

REVERSED AND REMANDED (*with directions*).

*Ward & Collins* for appellants.

(1) The court erred in the admissibility and rejection of testimony. Thompson v. Irish, 99 Mo. 160; Coble v. McDaniels, 33 Mo. 363; O'Neil v. Crain, 67 Mo. 250. (2) Regardless of whether or not John Jones was divorced from his first wife, still his marriage to the second wife, whether it be ceremonial or common law; his holding her out as his wife and cohabiting with her as such; his and her recognition of each other as man and wife; that relation continuing until his death, these children being born of such relation are legitimate under the law and inherited from their father. Sec. 342, R. S. 1909; Lincecum v. Lincecum, 3 Mo. 441; Dyer v. Brannock, 66 Mo. 391; Pratt v. Pratt, 5 Mo. App. 539; Johnson v. Johnson, 30 Mo. 72; Buchanan v. Harvey, 35 Mo. 281; Green v. Green, 126 Mo. 17. There was a ceremonial marriage, but whether or not there was a ceremonial marriage, there was beyond question a common law marriage which is good under this statute. Dyer v. Brannock, 66 Mo. 391; Cargile v. Wood, 63 Mo. 501; Bishop v. Investment Co., 229 Mo. 729; Plattner v. Plattner, 116 Mo. App. 405. (3) "Where parties have cohabited together and held themselves out as man and wife, and there are circumstances from which a present contract may be inferred, the law, out of charity and in favor of innocence and good morals, will presume marriage. The law in general presumes against vice and in favor of innocence and good morals, and on this ground holds acknowledgment, cohabitation and reputation presumptive evidence of marriage." Cargile v. Wood, 63 Mo. 501; Ashford v. Insurance Co., 80 Mo. App.

643; Plattner v. Plattner, 116 Mo. App. 412; Johnson v. Johnson, 30 Mo. 90. "And this presumption cannot be overthrown except by the most cogent proofs." Plattner v. Plattner, 116 Mo. App. 412. Plaintiff cannot recover in this case regardless of the statute making legitimate these children, because plaintiff failed to show that this marriage to the second wife was not legitimate. The burden of proof was upon the plaintiff, and it was not sufficient to show a former marriage and to show that the first wife was still living, for the presumption is that there was a divorce obtained, and the burden is upon the plaintiff to overcome this presumption. Johnson v. Railroad, 203 Mo. 401; Klein v. Laudman, 29 Mo. 259; Waddingham v. Waddingham, 21 Mo. App. 609; Leech v. Bank, 99 Mo. App. 684; Winter v. Lodge, 96 Mo. App. 17; Maier v. Brock, 222 Mo. 82; Lincecum v. Lincecum, 3 Mo. 441. Every presumption of law is in favor of their legitimacy. Johnson v. Johnson, 30 Mo. 72; Boyer v. Dively, 58 Mo. 510.

*Arthur L. Oliver* for respondents.

(1) The ruling of the trial court upon the excerpts of testimony contained in appellants' brief was proper. (a) The testimony of John Jones as to whether he was married to Babe Harrington is clearly competent. Declarations of a deceased member of a family as to family history or pedigree are one of the oldest exceptions to the hearsay rule. 2 Wigmore on Evidence, Sec. 1480; 6 Ency. of Ev., 447; Flora v. Anderson, 75 Fed. 217; Topper v. Perry, 197 Mo. 544; Imboden v. Trust Co., 111 Mo. App. 235. (b) The admission of improper evidence before the court without a jury is harmless where there is sufficient proper evidence on which to base a decision. Young v. Hudson, 99 Mo. 102; Kleiman v. Geiselmann, 114 Mo. 437; Laumine v. Gehner, 110 Mo. 122; Crook v. Tull, 111

Mo. 283. (c) The testimony of J. M. Ballard was competent. As a licensed attorney in the state of Arkansas, he made an examination of all the records of the circuit and chancery courts in Mississippi county, Arkansas, where Jones and his wife Emma lived. It was shown by him that these records were voluminous, and he was then asked to show the absence of any record granting a divorce to either of these two lawfully married people. It was competent and proper to show the absence of such an entry in this manner. 2 Wigmore on Evidence, Secs. 1230, 1244; 10 Ency. Ev., 831; Canal Co. v. Kreybill, 17 Colo. App. 26. (2) The three cases cited by appellants deal, as here, with the relative rights of two sets of children by the same father but by different wives. In each case one or both of the parties to the second marriage acted in good faith. In the case at bar the trial court declared, as a matter of law, that if Babe Harrington acted in good faith in marrying John Jones, believing that he had been divorced, she and her children could inherit, but then found from the evidence that she did not so act, and this court is asked to weigh the testimony and set at naught the rule and precedent which are as old as the appellate courts. Green v. Green, 126 Mo. 17. The other cases cited by appellants throughout their brief—Dyer v. Brannock; Johnson v. Johnson, Admr.; Buchanan v. Harvey, and Cargile v. Wood decide nothing in point in the case at bar, as they all deal with the rights of heirs by the first marriage under certain cohabital relations, and Indian customs amounting to marital contracts without ceremony. In these cited cases the heirs were not handicapped with parents knowingly committing bigamy and acts of adultery. (3) The court gave defendants the benefit of all presumptions of innocence and legitimacy by its declaration of law numbered 3. To overcome these presumptions the court properly declared, as a matter of law, that "the burden of proof

is on plaintiffs to establish that the minor defendants are bastards and not capable of inheriting from their father, John Jones, and in establishing this fact said plaintiffs must show by the preponderance of the evidence that John Jones and his first wife were never divorced.'' Plaintiff met this burden of proof, and the court's finding of the facts is conclusive upon appellants. Keen v. Keen, 184 Mo. 366; Longuemere v. Busby, 56 Mo. 540; Turner v. Gibbs, 50 Mo. 556; Glade v. Ford, 131 Mo. App. 164; Collard v. Burch, 138 Mo. App. 94. Presumption of innocence and legitimacy, as enunciated in the cases of Platner v. Platner, Johnson v. Railroad, and Maeir v. Brock, does not apply, where proof positive, as in the case at bar, discloses no divorce annulling the marriage of John Jones and his wife Emma; and where one of the parties of the alleged second marriage had actual knowledge, and the other had at least presumptive knowledge, of the first marital relations still existing. The presumption of a valid second marriage in the case at bar, which the court below required plaintiff to rebut, was overcome by proof of a valid first marriage, by showing that the wife of that marriage lived true to her marital vows, and by proof that the first marriage had not been dissolved by divorce. This in law was sufficient. 8 Ency. Ev., 464; Cole v. Cole, 153 Ill. 585; Cozier v. Hinchey, 143 Mo. 203; Snuffer v. Korr, 197 Mo. 182. Nor is this evidence weakened by appellants' insistence that the first wife, after her separation from Jones, later married, because her second marriage occurred after Jones was killed. (4) There was no valid ceremonial or common marriage between John Jones and Babe Harrington. Under Secs. 8280 and 8281, R. S. 1909, certain marriages are declared void. Among those enumerated are marriages between white people and negroes, and where either party contracts marriage while having a former wife or husband living, without being divorced from the former. Under Secs.

4720 and 4722, R. S. 1909, certain marriages are declared bigamous. These four sections now read as they did in 1891, about the time that Jones and Babe Harrington began cohabiting together. Keen v. Keen, 184 Mo. 373; State v. Cooper, 103 Mo. 273; Banks v. Galbreath, 149 Mo. 529. (5) There was no common law marriage. There was no evidence offered showing that there was ever a marriage contract, or agreement of any kind entered into by John Jones and Babe Harrington. No witness tells when or where or how long they agreed to live together, but, on the contrary, all the evidence points strongly, and the court below so found, that the relations between these parties began without the sanction of marriage.

LAMM, J.—In November, 1906, plaintiffs sued to try and to determine title to 77.15 acres of land in Pemiscot county, described by metes and bounds in the petition, and lying on the State line. From a judgment for plaintiffs, defendants appeal.

John Jones was the common source of title. His first wife was Emma Perry. By her he had a daughter, Addie, now intermarried with Dave Nelson, her coplaintiff. Some two years after the birth of Addie, John and Emma separated, and Emma (while John was yet alive) married Luther Brown, a minister of the Gospel. Afterward she died. John (it is claimed by defendants and denied by plaintiffs) married Lizzie C. Harrington during the life of his first spouse. Afterwards John was killed. Defendants Talitha, Josie and George Jones are his infant children by her. After John's death, Lizzie C. intermarried with her codefendant William Chism. All parties live in Arkansas.

The main issues threshed out below were divorce, marriage and bastardy.

The pleadings, proofs and admissions are such that, unless Addie is estopped to claim an exclusive

title, she inherits the land if she be the only legitimate child and sole heir of John Jones. *Contra,* if the infant defendants are his legitimate children, then Addie inherits only an undivided one-fourth and they the remaining three-fourths. So, if Lizzie C. was lawfully married to John Jones she is endowed. If, however, she was not, then she is not.

There was another issue, viz.: It is alleged in the answer that Addie and the defendants (as joint plaintiffs) brought a suit against one Briggance (the source or character of Briggance's title does not appear) to determine title in 1906 to the same land, in the Pemiscot Circuit Court; that such proceeding ripened into a decree vesting the title out of Briggance and into them; and that defendants at the instance and by the procurement and asquiescence of plaintiff Addie were put to such efforts, trouble, outlays and expense in and about that proceeding as raised an estoppel, wherefrom they plead estoppel in aid of their title.

By replication Addie admits such Briggance suit, but pleads her minority by way of avoiding the force of the estoppel.

The cause was tried to the court, and though instructions were asked for defendants, yet the nature of the relief sought, together with the issue of estoppel raised by the answer and the form of the judgment, put the case, we think, in equity. We have been inclined to view suits to determine and decree title as of equitable cognizance, except where the issues are so framed by the pleadings as to make the proceeding a law suit. There is nothing in the pleadings in this case showing either party entitled to a jury. In this view of it, we shall review the facts, and determine the case on our own estimate of them, giving to the court below the proper advantage of position in weighing oral testimony.

The facts are these:

Mississippi county, Arkansas, is just across the line from Pemiscot county, Missouri. About 1886 there lived on the North Chickasawba in said Mississippi county John Jones and Emma Perry. About 1886 or 1887 they were married by a justice of the peace. Their families lived not a great way apart and both the Perrys and the Joneses were farmers. After his marriage John cropped in the neighborhood for four or five years. As said, some two years after Addie was born John and Emma separated. There lived not far away one Harrington. Harrington had a daughter, Lizzie C. Emma Jones and Lizzie Harrington were "girls together," and though Harrington moved about a good deal, yet the young women knew each other pretty well. Whether it was John or Emma at fault in the separation does not appear. The best we can make out is that their ways parted about 1891. They never lived together as husband and wife thereafter, or in any wise recognized any conjugal duty to each other. She returned to her father's house with her baby, and John raised a crop and stayed in the neighborhood with his acquaintances for a time variously estimated at from four to eight months, when, to use the phrase of the witnesses, he "ran away" with Lizzie Harrington.

Miss Harrington's sister "ran away" at the same time with one Reece. They one and all floated in a dug-out or canoe from North Chickasawba to a place or creek called Marked-Tree, there took a train to West Memphis, there crossed the Mississippi river, and went on to Bolivar county in the State of Mississippi. On the way to Bolivar county they stopped at a way station, according to Lizzie's account, and both these run-away couples there hastily married, a man officiating who "looked like" a minister, and there is faint evidence of a "license." Reece did not testify and his whereabouts are unknown. Lizzie's sister did not testify. She seems to have afterwards married

a man named Scallion, but whether she is living or
dead Lizzie said she did not know.    After several
months Jones and she come back to Yarbro, Missis-
sippi county, Arkansas, hard by North Chickasawba
and there, all the testimony shows, they lived to-
gether and held each other out as man and wife in the
face of all men and to the knowledge of their old ac-
quaintances and kinsfolk.    She was thence forward
known as Mrs. Jones.    Not far away at the time lived
Emma, the first wife, and the testimony tends to show
she knew they were consorting publicly together as
man and wife and holding themselves out as such.
After one or two years they moved a little way north
just over the State line into Missouri, about ten miles
from Yarbro and North Chickasawba, and settled on
the farm in question, which Jones then bought.    While
at Yarbro he took his child, Addie, and kept her in his
family.    While not quite clear, yet we gather when
Jones made that move he took Addie with him and
kept her there at his new home with his putative new
wife, until he was killed on June 2, 1896.    At their new
home in Pemiscot county, as in their old in Missis-
sippi county, Arkansas, John Jones and Lizzie lived
continuously, openly and habitually as man and wife,
the neighborhood recognized and treated them as such,
and this recognized and reputed relation continued
down, as said, to the day of his death.    There is no
countervailing testimony on this phase of the case.
In the meantime there was born to the twain three
children, the infant defendants, and those three, with
Addie, supervised and mothered by Lizzie C., made
up his household.    During all this time, as said, his
first wife lived a few miles away in Arkansas.    While
the testimony on behalf of plaintiffs leaves the matter
in doubt, yet it sufficiently appears from other testi-
mony that the first wife intermarried with Luther
Brown, a preacher, during the lifetime of John Jones,
as said, and had a child by him.    Straightway on the

death of John Jones the first wife claimed Addie and
took her away.  There was no record of a divorce by
either John or Emma from the other introduced in evi-
dence.  The records of Mississippi county, Arkansas,
were searched for such record by Mr. Ballard, one of
plaintiffs' attorneys, but he found no such record.
Lizzie testified that before she ran away with Jones,
when he asked her to marry him, he told her he had
a divorce, that she believed him without making fur-
ther inquiry, and married him in good faith as a
single man.  She lived some distance from Osceola, the
county seat (thirty miles, with no railroad) and had
never been there.  We take it the road there at that
time lay through swamps and was not an inviting line
of travel.  She explained her elopement by saying that
her father objected to Jones as a suitor for her hand,
because he (Jones) was a "widower" and "kind of
rough."  On behalf of plaintiffs, the brother of the
first wife was allowed to testify over the objections of
defendants' counsel, that Emma Jones was never di-
vorced from John and that John Jones was never di-
vorced from Emma.  He testified further that if they
had been divorced he would have known of it "by the
report."  He was allowed to testify that the com-
munity of North Chickasawba, his home region, would
have known of such divorce by "neighborhood ru-
mor," if there had been one; also that once when he
called at the house of John Jones in 1895, John and
Lizzie "got in a racket" and he heard John say to
her they were not married.  This she denied.  Else-
where in his testimony he said Jones told him so three
or four times.  One Hicks was also allowed to testify,
over the objection, that Reece told him on the re-
turn from Bolivar county that "they were not mar-
ried."

At the time of the trial the land was not occupied.
Most of it was not cleared.  The little bit that had

been under the plow had again run wild, and we infer the total value was small.

Questions hinging on challenges to some of plaintiffs' testimony and adverse rulings below are in the case, and if it is necessary to determine those questions the facts will appear further along, as well as any other facts vital to the justice of the case.

As to the issue of estoppel, it is out of the case on appeal. When Mrs. Nelson was on the stand she testified she became of age October 18, 1906. This was after all four children brought a suit through their joint guardian and curator against Briggance to reinvest themselves with title. The Briggance suit was determined on the 8th of August, 1906. The record shows that on that day it was adjudged in that suit that "the plaintiffs" (the four children) "are the owners of the property and the defendants have no interest in the property." When Mr. Ballard, one of plaintiffs' counsel in this suit, and plaintiffs' counsel in the Briggance suit, was on the stand, a question was asked him on cross-examination intended to elicit facts creating an estoppel. On objection, evidence of that character was ruled out. That ruling was put upon the foot that Addie Nelson was a minor at the time. We do not read the briefs of appellants' counsel as predicating error of that ruling, or that they claim title through the judgment in the Briggance suit. Indeed, counsel treat the whole matter as of little or no appellate value. There is no plea of *res adjudicata* in the case and we need not look into that matter or estoppel. Accordingly those questions are put to one side.

A foreword to the opinion may not be amiss, viz: In the presence of blameless and innocent children, and in the presence of a situation made sordid and squalid by ignorance and poverty, all of which appear in the lines and between the lines of this record, the facts (read through judicial blushes) bespeak judicial

charity and mercy to the very verge of the law to work out a just result.

In our opinion the judgment is wrong and should be reversed. This because:

(a). Of divorce, marriage and bastardy. There is a presumption that when a status is once established it is generally presumed to continue until the contrary is made manifest by the proof. That sensible presumption (subject to exceptions) is of everyday use in the affairs of man, and such presumption is a legal one constantly applied by courts. Under it a status of marriage once shown might be presumed to continue until he who asserts the contrary establishes its discontinuance by divorce. But in all enlightened systems of jurisprudence it has been found necessary to make exceptions to general rules, which by reason of their universality are sometimes found deficient to attain the full ends of justice in a given case. Such exceptions, when well established as grounded on principle, are as potent as the general rule itself. There is a primary maxim of the law that, in favor of life, liberty and *innocence,* all things are to be presumed. (*In favorem vitae, etc.*). There is another: A wrong is not to be presumed. There are presumptions springing from the loins of those noble maxims, which are the crowning glory of our law, viz., that the law presumes innocence, not guilt; morality, not immorality; marriage, not concubinage; legitimacy, not bastardy. Accordingly when the presumption that a marriage once established continues to exist is confronted, under proper proof, by presumptions in favor of innocence rather than crime, in favor of morality instead of vice, the former presumption gives way and the latter obtain. So that the settled law in this jurisdiction is that if A and B are married, and afterward A and C by virtue of a common law or ceremonial marriage consort together as husband and wife during B's life, under the circumstances disclosed in this rec-

ord, the burden of proof that A and B were not divorced (and that consequently the relations between A and C are meretricious and criminal) is upon the party asserting the fact, though it is a negative fact and hard to prove. On plaintiffs then was the burden to prove the negative fact that there was no divorce between John Jones and Emma Jones. We have been so lately and fully over this matter, speaking through our brother GRAVES, in the Johnson case, *infra,* that it would be unseemly and smacking of vanity in the writer to attempt to further expound the law. [Johnson v. Railways, 203 Mo. l. c. 401, *et seq.,* and cases cited.] That case was followed in the later case of Maier v. Brock, 222 Mo. 74. [*Vide,* Plattner v. Plattner, 116 Mo. App. l. c. 412; Bishop v. Brittain Inv. Co., 229 Mo. l. c. 729, *et seq.*]

That there was at least a common law marriage between Harrington and Jones is sufficiently established. For several years they openly held themselves forth to the world in the neighborhood of their old acquaintances and kinsfolk by the manner of their daily life, by conduct, demeanor and habit as man and wife. They assumed that mutual relation apparently in good faith. The community accepted it. Children were born to them. They established a home to which Jones took his child by his first wife and reared her. They seem to have been treated as husband and wife by the relatives of both women. It is unthinkable that in a Christian community however primitive, the first wife and her relatives would have permitted Addie to remain in the Jones household if they thought him hatching a brood of bastards in a wanton nest. Did they knowingly subject her to the domination and teaching of an immoral woman? On what decent theory did the first Mrs. Jones remarry except on the assumption she was divorced? The main witness for plaintiffs, the brother of the first Mrs. Jones, puts himself in the attitude of eating salt at Jones's table in a.

house desecrated and dishonored by flaunted lust, if his theory as a witness be accepted. .

This court has put itself on record as in favor of stringent proof of common law marriages. [Bishop v. Brittain Inv. Co., supra.] We think the proof in this case meets the rigid and wholesome requirement of that case. It comes within the facts and doctrine of a line of Missouri cases cited in appellants' brief. (q. v.).

Deeming a common law marriage established, plaintiffs did not successfully carry the burden of showing no divorce. Two or three witnesses who knew the parties spoke of never hearing any one speak of a divorce. They were allowed to tell there was no neighborhood rumor of one. But that character of proof, if of any value at all, is not the cogent proof required by the law to overcome the strong presumption of innocence.

Mr. Ballard, as said, one of plaintiffs' attorneys, described himself on the witness stand as judge of the county court, justice of the peace and notary public in Pemiscot county. Assuming he has the astuteness and learning appurtenant and appertaining to that aggregation of offices, yet we cannot assume that his investigation of the court records of the courts of another State furnishes the best evidence of their contents. He went to Osceola in Mississippi county, Arkansas, a few days before the trial, searched the records there and was allowed to testify that he found no decree of divorce between John Jones and Emma Jones. The law requires the best proof the case is susceptible of. It does not require impossibilities and therefore did not require the production in our courts of the records of the courts of a sister State. Where there is a mass of records to examine, the law does not require the production of certified copies of all of them to prove the negative fact that a certain decree cannot

be found. Such proof may rest in parol *ex necessitate rei.* But there should and could have been furnished the testimony of the custodian of those records, or of other persons who *qualified* as familiar with them and all of them, in order that the negative fact might be clearly shown. Mr. Ballard testified he examined certain books and indexes. How did the trial court know they were all of the minute books, record books and indexes? All the trial court knew in that behalf he knew from what Ballard testified. How could a stranger to the records like Ballard *know?* As figs do not grow on thorns, neither does certainty grow on uncertainty. In Chilton v. Metcalf, 234 Mo. 27, where evidence of the same character was elicited from the clerk of the court himself, comment is made upon the fact that the clerk's evidence did not satisfactorily account for all the records.

While creating suspicion and doubt, yet we hold the testimony too loose and insufficient to clearly prove there was no divorce at Osceola. Moreover, why should we assume the doubtful fact that Emma Jones may not have acquired a residence elsewhere than in Mississippi county, where she herself could have procured a divorce?

It is common learning that under the old common law, in aid of legitimacy of children, if the husband be shown to have been "within the four seas" within a stated period, and was capable of begetting issue, the wife's child was allowed to be legitimate. That liberal rule bespeaks an ancient and rooted judicial tenderness toward children. Neither in old nor in modern times has it ever been allowed just to hold a child a bastard unless there is no judicial escape from that dire conclusion.

The premises considered, the Scotch form of verdict, "not proved," must be our judicial finding on the negative issue of no divorce and on the issue of bastardy.

(b).  There is another view of the case equally conclusive, viz.:  In our statute of Descents and Distribution is the following:  "The issue of all marriages decreed null in law, or dissolved by divorce, shall be legitimate."  [R. S. 1909, Sec. 342.]  That statute once read:  ". . . and the issue of all marriages *deemed* null in law or dissolved by divorce shall nevertheless be legitimate."  [R. S. 1825, p. 328, Sec. 8.]  For the first time in G. S. 1865, p. 519, Sec. 11, the statute uses the word "decreed" instead of the former word "deemed;" and as there changed it has been handed down as live written law to this very day. When that change in the statute was first brought to the attention of the courts the notion was indulged that probably the change was a clerical error.  [Pratt v. Pratt, 5 Mo. App. l. c. 544.]  However, in Green v. Green, 126 Mo. 17, it was held that if the change had only appeared in one revision it could justly be held an inadvertence.  But since it appeared continuously in subsequent revisions this court would assume it was intentionally used.  On that assumption we held the word "decreed," in a *technical* sense, is almost meaningless in practical effect—further, that the Legislature did not intend its meaning should be materially different from the word "deemed" in the original act. [P. 24.]  Adopting that view of it on the reasoning of the Green case, then we fall back upon the exposition of the act as it originally read.  There is a wealth of such exposition in our reports.  The student in jurisprudence curious to follow the stream of law interpretation up to its original source is referred, for the philosophy and application of that statute, to Lincecum v. Lincecum, 3 Mo. 441; Johnson v. Johnson, 30 Mo. 72; Buchanan v. Harvey, 35 Mo. 276; Dyer v. Brannock, 66 Mo. l. c. 418, et seq.; Boyer v. Dively, 58 Mo. 510; Green v. Green, supra; Gates v. Seibert, 157 Mo. l. c. 272, *et seq.*

In the Lincecum case a man had a second wife in Missouri and a first wife in South Carolina. The children of the second marriage were allowed to share in the estate with those of the first. In the Johnson case there was a common law marriage with an Indian woman, a daughter of Keokuk, and children were born thereof. Afterwards Johnson sent Keokuk's daughter back to her tribe, thereby exercising a tribal law right so to do. Afterwards, on the eve of his marriage to a white woman, he declared himself a bachelor. Afterwards he reared his Indian children as his own, educated them and gave them a place in his social circle. We held them legitimate. In the Buchanan case, Harvey, while residing with a band of the Blackfeet tribe of Indians on the upper Missouri, where under Indian custom polygamy was lawful, married two squaws and died in the Indian country, leaving a daughter by each, Susan and Adeline. In the distribution under an administration in St. Louis, Susan and Adeline were declared legitimate under the doctrine of the Johnson case. In the Dyer case, Wilson contracted a common law marriage with Jane Collins and from that union sprang a daughter Cynthia; five years afterwards during Jane's lifetime he married Sarah Ann Adams by whom he had a child who survived its mother and died. Afterwards he sent for Jane Collins and Cynthia, lived with them until his death and treated Cynthia as his daughter. Sarah Ann Adams owned real estate which was inherited at her death by her child by Wilson. We held that he inherited the property from his child by Sarah Ann Adams, and that the descendants of Cynthia (the latter marrying one Dyer) were the offspring of a legitimate child of Wilson and were entitled to recover the property in ejectment. In the Green case, William Green married in Ireland, abandoned his wife, was never divorced and during her lifetime married in this country, reporting

himself a single man. The children of the last wife were held legitimate.

In construing that beneficent and remedial statute we ought not to apply the discredited and bitter proverb that the fathers have eaten sour grapes and the children's teeth are set on edge. That proverb was held unjust by noble authority at a very early day. [Ezek. xviii: 2-3; Jer. xxxii: 29-30.] We are bound to construe the statute so as to advance the interest of innocent children for whose benefit the statute was passed and who, for no fault of their own, up to that time were in hard lines. The plain language of the statute, as illuminated by the construction given it by this court, makes children in the fix of the infant defendants legitimate. We confess to an indisposition to bastardize them by implication or construction. Says NAPTON, J., in the Dyer case: "We have no authority, upon grounds of public policy or for the promotion of private morals, to make restrictions or exceptions which the Legislature has not seen proper to make." [P. 419.] Attending to that language it must be steadily borne in mind, as said, that the reason of the existence, the essential object, of the law was to help blameless children and spare them penury and infamy. We are not unmindful of the precept that the greatest incitement to guilt is the hope of sinning with impunity, but the force of that statute, as indicated by the above quotation, is not spent on promoting the morals of parents. In the Green case some stress is laid on the good faith of at least one of the parties contracting the second marriage. It may well be that in order to constitute a marriage at all there should be an element of good faith, a *bona fide* intention to marry, as over against an intention to indulge a mere prank, or mere casual sexual commerce, etc. But even on that view of the law, we think the good faith of Miss Harrington sufficiently appears in this case. She is not to be judged by dainty speculative refinements.

Ignorant, immature and taking color from a lowly and primitive environment, we must allow some value to those factors on the question of good faith. Her faith must be seen through her works. Her actions speak louder than any words in showing her good faith when she lived for half a decade after her elopement, fearlessly and openly among her neighbors and acquaintances filling the office of a wife and a mother with the man she then took as her husband. Those officers, courts and grand juries charged with law enforcement in the region seem to have acquiesced in the status she established for herself until Jones died. Neither they nor her neighbors cast any stones at her. Is that not some little evidence they thought her honest?

The views expressed make appellants' assignments of error relating to the admission of testimony fill no office worth while.

For the reasons set forth the judgment should be reversed and the cause remanded with directions to enter a decree in accordance with this opinion. Let that be done.

Coming into Banc from Division One on a dissent, the foregoing opinion is adopted by Banc as its opinion. All the judges concur except *Graves* and *Woodson, JJ.,* who dissent.