SANTILL A. K. A. GENEVIEVE SANTILL, APPELLANT, *v.* ROSSETTI, ADMINISTRATRIX, ETC., ET., APPELLEES.

Common Pleas Court, Ashtabula County.

No. 48711.  Decided October 5, 1961.

*Mr. Phillip J. Cantagallo*, for appellant.
*Mr. Tom R. Bailey*, for appellees.

PONTIUS, J.  This is an action for declaratory judgment, the purpose of which is to determine the legitimacy of two minor children.  The case is here under favor of Section 2101.42, Revised Code, on appeal on questions of law and fact from

the Probate Court, where no record of the testimony was taken. The issue is whether or not Charles T. Santill and Debbie Kay Santill, both minors, inherit under the provisions of Section 2105.06, Revised Code, as the legitimate children of Nick C. Santill, who died intestate, a resident of the city of Ashtabula, on February 22, 1960. Also indirectly involved are the questions of the right of these minor children to a year's support under Section 2117.20, Revised Code, and the right to hold property exempt from administration or to a cash allowance in lieu thereof under the provisions of Section 2115.13, Revised Code.

There is no real conflict in any of the evidence. It is clearly established from the evidence that at the time of his death on February 22, 1960, decedent, Nick C. Santill, was lgeally married to the Plaintiff-Appellant, Jennie Santill, whom he had married December 11, 1948, in Kentucky. There were no children born of this marriage. The deceased had been married previously and the Defendant-Appellee, Beatrice Rossetti, who is also the administratrix of his estate, is a daughter of this prior marriage, which terminated in divorce. In May of 1955 the deceased and Jennie Santill separated, but no divorce was ever filed. She continued to reside on West 8th St. in Ashtabula, where these parties had always lived, and the deceased contributed to her support substantially and regularly up to a very short time prior to his death. The deceased, likewise, continued to live in Ashtabula.

In 1955 a young woman twenty-one years of age, by the name of Kay Farrell, operated a restaurant on West 5th St. in Ashtabula and lived in a nearby apartment. Nick Santill, the deceased, then lived in a rented room across the street from the restaurant. The deceased ate some of his meals in this restaurant and became acquainted with Kay Farrell. Their relations quickly became intimate and continued so with frequency, and Kay Farrell became pregnant. Incredible as it may sound and unbelievable as it may have been, had there been any evidence to the contrary, the undisputed evidence, nevertheless, is that Kay Farrell did not know that the deceased had a wife living only a short distance away in the same city. Shortly after she became pregnant Kay Farrell told the

deceased about it, and, according to her testimony, in August of 1955 they had a conversation in which he told her, "We will be husband and wife. I will take care of everything. A marriage ceremony is not necessary." (It might be observed at this point that Kay Farrell was brought up in an orphanage with three other brothers and sisters, their father having died when she was three years old.) Following this confidence and conversation Kay Farrell and the deceased lived together as man and wife in a rented apartment on West 5th St. in Ashtabula, until his death. There is no question but what following the birth of the first child, Charles T., the deceased was the sole support of this family. Kay Farrell was known to some people as Mrs. Santill but to others as Miss Farrell; the deceased introduced her to others as his wife; and altho their social life was limited, it appears that Kay Farrell and the deceased were recognized by his friends and relatives (the latter, of course, knowing of Jennie Santill) as husband and wife. They appeared together in public as if they were husband and wife. Kay Farrell, herself, sometimes used the name "Farrell" and sometimes "Santill." There never was any attempt at a ceremonial marriage; the deceased did not present Kay Farrell with a wedding ring; both were Roman Catholics, but only occasionally attended church functions, seldom attended mass, and never communion.

Just before the son, Charles T., was born on March 21, 1956, Kay Farrell entered Ashtabula General Hospital under the name of Farrell, and made a cash deposit of $100.00, which was furnished her by the deceased. It was at this time that Kay Farrell learned from the deceased about his wife, Jennie Santill. The deceased visited her in the hospital following the birth of the child much the same as any other husband or father would do. The same arrangements were made upon her entering the hospital just before the second child, Debbie Kay, was born, March 4, 1958. Kay Farrell and the deceased argued frequently and violently over the fact of no divorce and no legal marriage, the deceased claiming to her that he could not get a divorce and the Church would not recognize it.

The birth certificate of each child did not list the name of the father, and this is explained by the fact that Kay Farrell

gave to the hospital official all the necessary information, but because the father was already married, therefore, as a matter of public policy such information was withheld by the hospital official. There is no question but what the deceased often proudly, openly, and publicly acknowledged each of these children as his own. On July 27, 1958, both children were baptized in the Catholic Church and Baptismal Certificates show each child to be the child of the deceased, Nick C. Santill, and Kay Farrell. Arrangements for the baptismal were made by the deceased.

The deceased suffered with cancer, was in the hospital twice, was operated upon, and after release from the hospital was cared for at home by Kay Farrell. He was returned to the hospital, where he died February 22, 1960.

There is no question, of course, and no claim is made to the contrary, but what Kay Farrell is not and cannot be the legal widow of the deceased, even at common law, if for no other reason than the fact that the deceased was still legally married to Jennie Santill at the time of his death.

The question as to whether or not these two minor children are the legitimate children of Nicholas C. Santill is to be determined only from a proper interpretation of Ohio's legitimation statute, Section 2105.18, Revised Code, the pertinent part of which so far as this case is concerned, reads as follows:

"When a man has children by a woman and afterward intermarries with her, such issue, if acknowledged by him as his children, will be legitimate. The issue of parents whose marriage is null in law shall nevertheless be legitimate."

Is the relationship between Kay Farrell and the deceased, shown by the evidence in this case, a "marriage" within the meaning of this statute? If it is, then it is clear that legtimation attaches; if it is not such a "marriage," then these children are illegitimate.

The statute in Ohio dealing with this subject matter is patterned after the Virginia statute. At the time of the passage of the Virginia statute the law in Europe on the subject was substantially this: in England no legitimating of bastards whatsoever was permitted; under the civil law, the law of Scotland and Code Napoleon, an adulterine bastard could not become

legitimated by subsequent legal marriage of its parents, but all other bastards whose parents could legally marry at the time of begetting were legitimated by the subsequent marriage of the parents followed by an acknowledgment of the child by the father. (*Ives* v. *McNicoll*, 59 Ohio St., 402.) The Virginia statute was passed in 1785, and Ohio's first statute was passed February 22, 1805, and is found in 3 O. L., 281, and reads as follows:

"An act, regulating the course of descents and distribution of personal estates.

\* \* \* \* \* \*

"Sec. 12. That in making title by descent, it shall be no bar to a party, that any ancestor, through whom he derives his descent from the intestate, is or hath been an alien a bastard; also, shall be capable of inheriting or of transmitting inheritance on the part of their mother, in like manner as if they had been lawfully begotten of such mother.

"Sec. 13. That where a man having by a woman one or more children, shall afterwards intermarry with such woman, such child or children, if recognized by him, shall be thereby legitimated the issue, also in marriages deemed null in law, shall nevertheless be legitimate."

It is to be noted that the punctuation in the original draft of this enactment leaves something to be desired, but the impact of the statute seems, nevertheless, clear. When this same enactment became part of the Revised Statutes (see 51 O. L., 499) the above two sections of the original act became sections 15 and 16, respectively, of the enactment, and read as follows:

"Sec. 15. Bastards shall be capable of inheriting or transmitting inheritance on the part of their mother in like manner as if they had been born in lawful wedlock, and if the mother be dead the estate of such bastard shall descend to the relatives on the part of the mother as if the intestate had been legitimate."

"Sec. 16. When a man shall have by a woman one or more children, and shall afterwards intermarry with such woman, such child or children, if acknowledged by him as his child or children, shall be deemed legitimate; the issue of parents whose marriage shall be deemed null in law, shall nevertheless be legitimate."

In the case at bar these children might properly be classed as adulterous bastards rather than adulterine bastards, since their father was already married to another woman, but their mother was single. At the outset of determining what is the policy of the state of Ohio as expressed in this statute and in trying to interpret the statute in light of that policy and the language in the statute, we should keep in mind:

1. The statute does not specify any particular type of "marriage" or any classification of bastards to which and to whom the statute shall or shall not apply—none are excluded;

2. The deceased might have designated either or both of these children as his heir by descent under the provisions of Section 2105.15, Revised Code, and in that event they would inherit *from him* but not *thru him*. See *Blackwell* v. *Bowman*, 150 Ohio St., 34;

3. If the children had been adopted by the deceased they would inherit both from and thru him. (*Flynn* v. *Bredbeck*, 147 Ohio St., 49);

4. Common Law marriages are not void or against public policy in Ohio, but are legal marriages. (*Umbenhower* v. *Labus*, 85 Ohio St., 238; *Howard* v. *Central National Bank,* 21 Ohio App., 74.)

In the case of *Wright* v. *Lore*, 12 Ohio St., 619, A and B were married in Canada. Their issue was the Plaintiff. A came to Ohio and married X while still married to B, X being ignorant of such fact, and had four children by her. A died. The query was whether these four children inherited as children of A. The Court held in the affirmative, applied the statute in question, and said that tho the marriage was null in law, the Plaintiff was, nevertheless, legitimate. The fact situation was held to be within the letter and spirit of the statute, and, that "innocent children of a *marriage defacto* came within the letter and spirit of the statute." (Emphasis added.)

In *Morris* v. *Williams*, 39 Ohio St., 554, there was a slave marriage in Virginia, but under Virginia law slaves could not (then) enter into any form of valid contract, marriage or otherwise. The issue of that marriage brought suit in Ohio for Ohio lands claimed by inheritance after the Emancipation Proclamation. The Court held that tho the marriage was null

in law by Virginia law, Plaintiff, nevertheless, was legitimate and did inherit.

*Ives* v. *McNicoll*, 59 Ohio St., 402, is the leading case in Ohio on this question. (For a report of this case in the trial court see 4 O. D., 75, in the Court of Appeals, 5 C. D., 555, 12 C. C., 308.) In this case an adulterine bastard born in Kentucky with the parents later entering into a legal marriage and there being a clear acknowledgment by the father, was held legitimate under the Ohio statute. While this case deals with the first part of the statute in question, whereas the case at bar brings into play the second part of the statute, the *Ives case* is, nevertheless, enlightening for an interpretation of the statute. The syllabi of that case are as follows:

1. "A child begotten by parents who were at the time not intermarried, and who could not then enter into a legal contract of marriage, may be legitimated under Section 4175, Revised Statutes, by the subsequent legal marriage of the parents and the acknowledgment of the child by the father as his child."

2. "M, an unmarried man, had a child by R, a married woman; R afterwards became divorced from her husband, and thereafter M intermarried with her and acknowledged the child as his child. Held: That the child was thereby legitimated, and upon the death of M, the child had all the rights of an heir of his body."

In the opinion after noting that the statute is not one which will encourage married persons to forsake marriage vows, etc., the Court said:

"Viewed in this light, the statute is a righteous enactment. While to visit the sins of the parents upon the innocent and helpless off-spring would shock every sense of right and justice. * * * That our statute was intended for the benefit and protection of the innocent off-spring, and not for their punishment on account of sins committed by their parents, is shown by the case of *Wright* v. *Lore* and *Morris* v. *Williams*."

The Court dispelled the argument that the wording of the statute was designed to affect only the situation where the parents *could legally marry* at the time of inception, and held that adulterine bastards were thus protected, and noted:

"Nothing is said in the statute as to whether the parents could or could not legally marry at the time the child was begotten. The general assembly having attached no such condition, the courts can attach none, and to do so would be judicial legislation."

The case of *Garner* v. *Goodrich Company*, 136 Ohio St., 397, brought the statute into consideration in connection with an Industrial Commission claim. The issue was whether the term "dependent child" as that term was used in the Workman's Compensation Act, included a child born to a mother whose husband was in the penitentiary and who had allegedly married the decedent in West Virginia while her husband was still incarcerated. The decedent had openly acknowledged paternity of the expected child, but was killed in an industrial accident thirteen days before the birth of the child. The Court applied the statute in question, and followed the rule announced in *Wright* v. *Lore*, holding that the child was within the letter and spirit of the statute and thereby was legitimated. It is true that the so-called second marriage was a ceremonial marriage, but, of course, it was null in law, without question. The Court held that "this statute removes the stamp of illegitimacy of the child whose father acknowledges it and intermarries with its mother, either before or after the birth of the child."

In *Folsom* v. *Furber*, 6 Ohio Opinions 2d, 509, the United States Court of Appeals, Sixth Circuit, in determining a Social Security problem, held that:

"The reason and spirit of Section 2105.18, Revised Code, is to legitimatize children; to permit legitimatized children to inherit from the father as well as the mother; and to protect innocent off-spring from punishment for the sins committed by their parents."

In this case the father of the child was already married, and the second marriage, with the child's mother was, at most, a common law marriage.

A great many states have statutes which are the same or similar to the Ohio statute, and the decisions from some of the sister states are of great interest. In a few states the issue of certain types of marriages, such as miscegenous marriage, are specifically excluded from the effect of such statute. In

most states, however, the statutes, like that of Ohio, do not expressly exclude the issue of any type of marriage from its benefits; and it is generally held that such a statute is required to be liberally construed in favor of innocent children. By the weight of authority the issue of a "marriage null in law," for whatever reason, are, nevertheless, legitimated by such a statute. The word "marriage" in the statute (at least, where one of the parties was innocent, as in the case at bar) has been held to include a bigamous marriage, a marriage where one or both parties were under statutory age, a marriage where no license was obtained, an incestuous marriage, and in some cases even a miscegenous marriage. So far as such a statute is concerned, the term "marriage" is said to mean a defacto marriage (*Wright* v. *Lore, supra*), a marital status (*Luther* v. *Luther*, 195 S. E., 594), an informal marriage (*Fout* v. *Hanlin*, 169 S. E., 743), or a purported marriage (*Re Filtzer's Estate*, 205 Pac. 2nd, 377).

Before passage of the original Ohio statute the Virginia statute had been consistently interpreted to hold no exclusions so far as types of marriages were concerned. See opinion in *Ives* v. *McNicoll, supra*. That theory of construction is still adhered to in Virginia. For examples, see *Heckert* v. *Hile*, 18 S. E., 841; *Henderson* v. *Henderson*, 187 Va., 121; 46 S. E. 2nd, 10; *Harmon* v. *D'Adamo*, 195 Va., 125; 77 S. E. 2nd, 318, where the statute was applied so as to permit the father, who had not consented to the adoption of his child, which he claimed was legitimated under the statute, to set aside interlocutory decree of adoption.

In *Evatt* v. *Mier*, 169 S. W., 817 (Ark.); L. R. A., 1916, C 759, the children of a man by a woman, whom he married while still having a lawful wife living, and from whom he was not divorced,. were held to inherit along with his children by the first wife under a statute providing that "issue of all marriages being null in law shall be deemed and considered as legitimate." The Court made strong reference to the early Virginia cases interpreting the statute of that state, and, in substance, held that since the statute did not exclude the issue of any particular type of marriage, it would not write any exclusion into the statute on the theory of public policy.

In *Leonard* v. *Braswell*, 36 S. W., 684 (Ky.); 36 L. R. A., 707, the statute provided: "* * * Issue of illegal or void marriage shall be legitimate." The statute was applied to a bigamous marriage.

In the following additional cases such a statute was applied so as to permit the issue of a second bigamous marriage to inherit:

*Workman* v. *Harold*, 2 S. W. 2nd, 679 (Ky.), the statute providing, "Issue of marriage deemed null in law shall, nevertheless, be legitimate." (Former wife living.)

*Buchanan* v. *Harvey*, 35 Mo., 276: The statute was identical to ours, both parts of it, and it was here held, where X had two Indian wives at the same time and a daughter by each, that the statute was applicable, and the Court referred to the fact that the evidence showed there was a "marriage in fact."

In *Hartwell* v. *Jackson*, 7 Tex. 576, the statute said, "* * * without regard to ground of nullity." The Court held the children of the second marriage legitimate, tho the mother had a former husband living, and used this language, "The rights of the children do not depend on the legality or illegality of the marriage of the parents."

In *Watts* v. *Owens*, 22 N. W., 720 (Wis.), the mother had a former husband living, and in *Lincecum* v. *Linceum*, 3 Mo., 441, the father had a former wife living.

In *Nelson* v. *Jones*, 151 S. W., 80 (Mo.), the Court applied the statute in favor of the issue of a second common law marriage, tho the first wife was still living; and did so on the theory "that it should apply the law to help blameless children and spare them the infamy (of being bastards)." The Court specifically said that it would not apply the proverb, "that the father having eaten sour grapes the children's teeth, therefore, are set on edge."

In *Jackson* v. *United States*, 14 F. Supp., 132, the question of legitimacy arose in connection with a claim under the War Risk Insurance Act. The Court said:

"Under S. C. law, continuance of illicit relations between man and woman cannot ripen into marriage, but declarations and the manner of the parties following a period of concubinage may be liberally construed to create a *state of marriage* in

support of legitimacy of off-spring, and of rights * * * of inheritance.'' (Emphasis added.)

In *Luther v. Luther*, 195 S. E., 594 (W. Va.), there is almost an identical set of facts as in the case at bar, the only exception being that there was no sexual intimacy before the marriage agreement. The Court, in following the rule of *Fout* v. *Hamlin (supra)*, said:

''When marital ceremonies prescribed by law and custom are disregarded, the weight of modern authority exacts that for a marital status to be instituted by concensus, it must be attached with certain stabilizing elements, namely, lawful capacity to contract a marriage, matrimonial intent, bonafides on the side of at least one of the parties * * * Because of Luther's existing marriage his conduct lacked both elements. Because the wife was aware that she and Luther would not 'be really married' her conduct lacked the element of good faith. Their conduct under such circumstances did not constitute an 'informal marriage' ''

While this case does not affirmatively apply the statute in favor of the off-spring, nevertheless, it is apparent that the Court would have done so had there been good faith on the part of at least one of the parties.

In *Campbell* v. *Allen*, 66 S. E. 2nd, 226 (Ga.), a purported common law marriage in Pennsylvania, tho the husband already had a wife by a prior legal, ceremonial marriage, was, nevertheless, held to be a marriage within the meaning of the Georgia statute.

In *Encinas* v. *Lowthian Freight Lines*, 158 Pac. 2nd, 575 (Calif.), such a statute was applied in a case where no marriage license had been applied for and one of the parties was under the statutory age limit.

In *Buissiere's Succession*, 5 Southern, 668 (La.), and in *Mund* v. *Rehaume*, 117 Pac., 159 (Colo.), the statute was applied to an incestuous marriage where entered into in good faith by at least one of the parties.

*Johnson* v. *Johnson*, 77 Amer. Dec., 598; 30 Mo., 72: *Buchanan* v. *Harvey, supra; Re Atkins Estate*, 3 Pac. 2nd, 682 (Okla.); 84 A. L. R., 491, are cases in which the statute was applied to miscegenous marriages.

In *Diggs* v. *Diggs*, 86 S. E. 2nd, 639 (Ga.), the children of a ceremonial marriage void because father was not divorced from a previous ceremonial marriage, were, nevertheless, held to be legitimate under the Georgia statute and entitled to a year's support from his estate. And again, in *Goza* v. *State*, 86 S. E. 2nd, 232 (Ga.), it was held that a defendant who was not divorced from his first wife but who married again in a ceremonial marriage and had a child, could still be prosecuted for abandonment of that child, the child being legitimate under the statute.

In *Green* v. *Green*, 309 Pac. 2nd, 276 (Okla.), the statute was applied in a reciprocal support action where the father of the child had a former wife living at the time of the second ceremonial marriage to the mother and the child was born afterwards. The Court said, "The fact that the statute of legitimation is found under the sections of our code on Wills and Succession makes no difference."

In *Copenhaver* v. *Hemphill*, 235 S. W. 2nd, 778 (Ky.), the Kentucky statute provided "* * * The issue of incestuous or mixed marriages shall not be legitimate, but the issue of all other illegal or void marriages is legitimate." The Court applied the statute, tho a purported common law marriage in Ohio was void because of a first wife living in Kentucky. The Court said, "The intention of the statute was to protect the innocent victim of these illegal relationships, and with two exceptions the Legislature has declared that issue of void marriages shall be legitimate." It will be noted that the Court made no distinction between a void common law marriage and a void ceremonial marriage.

Thus, it seems to this Court that the statute, Section 2105.-10, has a benign and even benevolent purpose as it affects innocent off-spring; that it must be liberally construed; that the word "marriage" in the phrase, "whose marriage is null in law," must be interpreted to mean a defacto marriage, a purported marriage, a marital statute, or an informal marriage. Further it is the opinion of this Court that where such a mariage is entered into in good faith by at least one of the parties and children are *afterwards born of that marriage*, such children are legitimate, regardless of the reasons for the nullity

of the marriage. Such a fact situation exists in this case. Surely, the law is not so cold and devoid of compassion as to relegate these children to infamy, ignominy, penury and poverty.

This Court finds Charles T. Santill, born Charles T. Farrell, and Debbie Kay Santill, born Debbie Kay Farrell, to be the legitimate children of the deceased Nicholas C. Santill. Decree accordingly will be prepared and submitted by counsel for Defendants by October 21. Exceptions to Plaintiff.