STATE OF MISSOURI, Respondent, v. JULIUS ROTTER, Appellant.

St. Louis Court of Appeals, January 4, 1916.

1. **INDICTMENTS AND INFORMATIONS: Verification: Affidavit.** Where, in a criminal prosecution, the prosecuting witness lodges with the prosecuting attorney an affidavit charging defendant with the commission of the offense, it is not essential to the validity of the information, under Sec. 5057, R. S. 1909, that it be founded upon such affidavit, but it is sufficient if it be verified by the oath of the prosecuting attorney upon information and belief.

2. **WIFE ABANDONMENT: Common Law Marriage: Sufficiency of Evidence.** In a prosecution for wife abandonment, under Sec. 4495, R. S. 1909, as amended by Laws 1911, p. 193, it was shown that, at the time a statutory marriage was attempted to be solemnized between the prosecuting witness and defendant, the latter had a wife living, of which fact the prosecuting witness was ignorant; that, subsequently, having become possessed of information concerning this fact, she spoke to defendant about it, and he told her that the prior marriage would "be all over with," and that they would continue to live together as husband and wife, to which proposal she agreed; that, subsequently, defendant was divorced from his prior wife; and that for several years after the divorce, defendant and the prosecuting witness continued to live together as husband and wife and defendant held her out to the world as his wife. *Held,* in passing upon the objection that the evidence was not sufficient to establish the existence of the marital relation, that, although the attempted statutory marriage was void, for the reason defendant had a wife living at the time, nevertheless the evidence established a common law marriage, which was sufficient, under the wife abandonment statute, notwithstanding the proposal was made by defendant before he was divorced from his prior wife, since, under the circumstances, the offer should be treated as a continuing one, which became effective,

State v. Rotter.

upon the divorce being obtained, by reason of its acceptance by the prosecuting witness and by reason of the parties thereafter living together as husband and wife.

Appeal from St. Louis Court of Criminal Correction. —*Hon. Calvin N. Miller,* Judge.

AFFIRMED.

*Chas. P. Comer* for appellant.

(1) When the prosecuting attorney files an information based upon the affidavit of a private person competent to testify in the case, he must file the affidavit with the information, and the latter must show on its face, when such is the case, that it is predicated upon the affidavit filed with it, in order that the defendant may know who his accusers are, the prosecuting attorney or some other person. State v. Schuettler, 181 Mo. 185-186; State v. Ransberger, 106 Mo. 138; State v. Whitaker, 75 Mo. App. 187. (2) The marriage of a man or woman where one of them has a husband or a wife by a prior marriage who is then living and undivorced is void and not merely voidable. Being a nullity, no decree is necessary to avoid same. Cartwright v. McGown, 121 Ill. 395. (3) In order to constitute a common-law marriage there must be a distinct and positive contract between a man and woman capable of assenting thereto, that they will live together as husband and wife. It is the consent of the parties and not their living together as husband and wife which constitutes a valid common-law marriage. Hiller v. People, 156 Ill. 511; Hebblethwaite v. Hepworth, 98 Ill. 132; Cartwright v. McGown, 121 Ill. 389; Appeal of Reading Fire Ins. Co., 113 Pa. St. 204; Harbeck v. Harbeck, 102 N. Y. 714; Hantz v. Sealy, 6 Binn. 405. (4) Mere abandonment and subsequent failure or refusal to support do not prove the criminal offense of wife abandonment. The State must further

show that the defendant had no good cause for the abandonment. State v. Satchwell, 68 Mo. App. 40. (5) It is not enough to authorize a conviction under the statute that there was abandonment and a failure and neglect to support the wife, but the State must prove beyond a reasonable doubt that the alleged abandonment was without a good cause and with a criminal intent, and that the defendant, also with a criminal intent, failed to provide for his wife. State v. Doyle, 68 Mo. App. 220. (6) In order to authorize a conviction for wife abandonment it is not enough to prove that there was an abandonment of and a failure and neglect to support his wife, but the State must show that the defendant was able to support his wife; that is, that he had an income or means, or that he had employment, so that he could support his wife, and, unless this is shown, the conviction cannot stand. State v. Linck, 68 Mo. App. 163-164; State v. Satchwell, 68 Mo. App. 41-42.

No brief filed for respondent.

NORTONI, J.—Defendant prosecutes this appeal, from a judgment of conviction on a charge of wife abandonment.

It is argued the court should have quashed the information on defendant's motion, for the reason it failed to disclose that it was founded upon the affidavit of defendant's wife, the prosecuting witness, and is not verified by her; but obviously this argument is without merit, for it appears the prosecuting attorney verified the information under his oath in accordance with the statute. It is true Lillian Rotter, defendant's wife, lodged an affidavit with the prosecuting attorney, charging defendant with the offense of wife abandonment, and. it is true, too, that this affidavit is not mentioned in the information. But be that as it may,

.the information is in all respects sufficient, in that its verification conforms to the statute.

The statute (section 5057, R. S. 1909) provides:

"All informations shall be signed by the prosecuting attorney and be verified by his oath or by the oath of some person competent to testify as a witness in the case, or be supported by the affidavit of such person, which shall be filed with the information; the verification by the prosecuting attorney may be upon information and belief."

The information in the instant case is verified by the prosecuting attorney and the facts therein stated are said to be true according to his information and belief. It appears from the jurat that the oath was administered to the prosecuting attorney by the judge of the St. Louis Court of Criminal Correction. Manifestly this verification of the information is sufficient and complies in all respects with the statute. The case of State v. Schnettler, 181 Mo. 173, 185, 186, 79 S. W. 1123, is in no wise in point here, for there the information was not verified either by the oath of the circuit attorney or by some person competent to testify as a witness, nor did it appear that it was based upon the affidavit of some person filed with the clerk of the court as required by law. Here, although an affidavit was made and lodged with the prosecuting attorney, that officer, it appears, determined to proceed on his own initative and exhibited the information accordingly verified as the statute requires in such cases.

The only purpose of the statutes in requiring the information to be supported by affidavit of some persons other than the prosecuting attorney is to afford a guaranty of the good faith of the prosecution. The affidavit, when filed, it is said, is not parcel of the in-

formation, but is separate and apart from it, or in addition thereto. [See State v. Brown, 181 Mo. 192, 79 S. W. 1111.] Manifestly, after the affidavit of the prosecuting witness was lodged with the prosecuting attorney as a guaranty of good faith of the prosecution, it was competent for him to disregard it further and proceed to inform against defendant through the office of an information signed and verified by himself as prosecuting attorney according to his information and belief.

The information was filed against defendant on November 20, 1912. It charges, in substance, that defendant abandoned his wife, Lillian Rotter, about the 13th day of June, 1910, without good cause, and has ever since failed to maintain and provide for her, etc. It appears defendant, at the time of the issuance of the information, was a practicing physician, engaged in conducting a hospital at Parsons, Kansas. He had abandoned his wife without good cause more than two years before, and, though she had diligently searched, she was unable to locate him definitely until shortly before this prosecution was commenced. The evidence is, that defendant came to St. Louis from New York several years ago and was first employed as a conductor on the street cars. During that time he met Lillian Levy and they were married by Rabbi Rosenblatt in October, 1903. Defendant appears to have been an ambitious and sprightly young man and desired to acquire an education in medicine. After the marriage, he, together with his wife, resided with his wife's parents, the Levys, at 1807 Wash street, where her parents owned a home. They lived there as husband and wife for several years and defendant attended a medical college in St. Louis until his graduation. After having graduated in medicine, he was installed as interne at the Jewish Hospital in St. Louis and received as compensation $30 per month, together

with his room and board at the hospital. The parties, however, maintained their home during the time at the residence of the parents of the prosecuting witness, and finally removed with her parents to 3707 Delmar avenue, where they continued to reside.

Witness after witness testified on the part of the State that the prosecuting witness treated defendant at all times with kindness, affection and respect and that she was a good wife to him in every respect; moreover that she and her parents aided him in acquiring his education in medicine. All of this time it is said defendant's wife was supported by her parents, except for an occasional small contribution on the part of defendant after he commenced drawing salary as an interne at the Jewish Hospital.

About the first of June, 1910, defendant received an appointment as superintendent of the Female Hospital at St. Louis, but, before he qualified and entered upon the duties of this office, the city authorities called for his resignation. The evidence is not clear as to why his resignation was called for, but it is to be inferred that the authorities learned of his prior conduct with respect to having contracted a marriage in St. Louis, while having a wife living in New York. But be this as it may, defendant resigned the position to which he was appointed and left the city for New York. At this time defendant and his wife were residing on Evans avenue with her sister and brother-in-law, temporarily, and the evidence is, that defendant said he was going to quit his wife, Lillian, because she was no longer in his class. The prosecuting witness testified that defendant, her husband, told her she was not sufficiently educated for him now that he had evolved into a doctor and that she would be a millstone about his neck in the future. Another witness says that defendant told him he was going to quit his wife because she was an ignoramus and not cap-

able of being introduced into polite society, where he intended to move in the future. Several other witnesses say that he said she was "not educated enough" for him, and the wife of the rabbi says defendant called on her husband shortly before he abandoned his wife and requested him for "an advice" as to how he could get rid of his wife, saying that as she was uneducated she was not his equal. To this query the rabbi replied, in substance, that he had married defendant and "Lillie" and that she was a good girl and he had no advice to offer on that subject, except defendant should continue to abide with her. After defendant had left the city, his wife, the prosecuting witness, followed him to New York and sought to locate him there, but was unable to do so. She searched for him here and there, and finally, it is said, discovered his whereabouts by writing to the Medical Board of the State of Kansas, in which State, at Parsons, he had set up a hospital and was practicing his profession.

The principal matter invoked in defense of the prosecution is to the effect that the parties were not husband and wife at the time of the alleged abandonment on June 13, 1910 nor at any time thereafter. The facts touching this matter are as follows:

It appears that defendant had been married before coming to St. Louis in the State of New York and that his wife was still living at the time of celebrating the marriage with Lillian Levy. However, this fact was unknown to the latter at the time. Defendant says he thought his first wife was dead and so proceeded to marry Lillian Levy in October, 1903 in St. Louis. At any rate, it is conceded that Lillian Levy acted in the utmost good faith in attempting to contract a marriage with him in October, 1903, which marriage was solemnized according to the forms of law and the rites of the Jewish religion by the Rabbi

Rosenblatt. She continued in ignorance of defendant's former marriage for two years thereafter, and lived with him all of the time as his wife. Finally, in 1905, it was reported that defendant had a wife living in New York, and the prosecuting witness spoke to him about the matter. She says he at first denied the fact of a prior marriage, and then said, "well, if it is so, it will be all over with, and you and I will live together as husband and wife." To this she agreed; furthermore, that defendant said he would be faithful and good and never mistreat her and he said it wouldn't amount to anything; that it was all over with. On this proposal of defendant, she continued to live with him as his wife from the fall of 1905 until June, 1910, when he abandoned her. During the fall of 1905, defendant instituted a divorce proceeding against his New York wife, and a decree of divorce was given him therein. Subsequent to this decree of divorce, the prosecuting witness and defendant continued to live and cohabit together as husband and wife until June 13, 1910, when he abandoned her.

It appears that defendant held her out to the world all that time as his wife and lived and cohabited with her as before; introduced her to numerous different persons as his wife; took her out with him to entertainments and other places as his wife during the years 1906 to June 13, 1910, when he abandoned her. It is true defendant says that he sought to separate himself from her at the time his prior marriage was discovered, in the autumn of 1905, but she threatened to prosecute him for bigamy if he did so; but this evidence is pointedly contradicted by the wife, and she asserts the fact to be that defendant proposed the marriage relation notwithstanding, saying that matter was all over with now; that they would live together as husband and wife and he would treat her as such ever after. She agreed to this proposal and

continued to reside with him as his wife, and a number of their neighbors, including the wife of Rabbi Rosenblatt, say that defendant held her out and treated her as his wife thenceforth. Indeed, Mrs. Rosenblatt says he called upon her husband shortly before leaving her in 1910, and requested advice from her husband as to how to get rid of "his wife Lillie." Moreover, it appears that, after defendant abandoned the prosecuting witness, he resided for a short time in Oklahoma and while there instituted a divorce proceeding against her and actually procured a divorce as though she were his wife, and this, too, on an affidavit of publication, wherein he stated that he did not know her whereabouts at the time. But this divorce was subsequently set aside by the court that granted it.

On these facts, the court found that, though the prior attempted marriage celebrated between defendant and the prosecuting witness by Rabbi Rosenblatt in October, 1903 was void, for that defendant was incompetent to contract matrimony because of the fact that he then had a wife living in New York, the relation of husband and wife existed between the parties in virtue of a common-law marriage consummated after the divorce in 1905.

It is argued that, as defendant proposed to the prosecuting witness, in 1905, prior to the rendition of the decree of divorce dissolving the former marriage, that they would continue thereafter as husband and wife, and she agreed thereto, no valid contract may be found therefrom, for the reason he was incompetent at the time to consent to such marriage. But in considering this question, it must be remembered that, on the part of the prosecuting witness, the marriage was not meretricious in the first instance—in other words, it was consummated in the utmost good faith. She became his wife, as she thought in 1903, acting in the utmost good faith to that end, and this marriage was

solemnized according to the forms of law and the Jewish religion, as is conceded throughout the case. Although it be true that this contract of marriage was subsequently discovered to be void, because defendant had a wife then living, it appears the prosecuting witness continued to cohabit with him as before, in the utmost good faith, on his assurance and promise that the prior marriage would all be over with immediately and they would continue as husband and wife in the future. Manifestly, in the circumstances of the case, this should be treated as a continuing proposition on his part, to become effective at least on the dissolution of the prior marriage through the decree of divorce rendered a month or two later, for it does not appear to have been withdrawn. The parties continued to reside and cohabit together for about four years after the divorce from the New York wife was decreed to defendant, and he recognized and treated her as his wife during all of that time. Besides holding her out to the world as his wife, calling her his wife, introducing her to friends as his wife, taking her out in society as his wife, he actually sued her for divorce in Oklahoma, after the abandonment on June 13, 1910. Obviously these facts and circumstances are sufficient to sustain the finding of the court that the parties were husband and wife in virtue of a continuing proposal of marriage on his part and acceptance on the part of the prosecuting witness and the subsequent conduct thereunder. Besides the facts above stated, it appears, too, all of their friends and acquaintances who were familiar with the fact that defendant procured a divorce in 1905 were given to understand that defendant and the prosecuting witness were husband and wife notwithstanding his prior marriage, and such was the general repute.

These facts tend not only to show general repute, continuous cohabitation and acknowledgment on the

part of the parties as husband and wife, but tend to show, too, a consent and agreement on their part to live and cohabit as husband and wife, and especially is this true when it is remembered that the prosecuting witness acted in the utmost good faith throughout all the years involved. The statute under which defendant is prosecuted provides in terms that, "No other evidence shall be required to prove that such husband was married to such wife . . . than would be necessary to prove such fact or facts in a civil action." [See section 4495, R. S. 1909 as amended by Laws of Missouri, 1911, page 193.] Under this statute, it is said in Kelley's Criminal Practice (3 Ed.) (Lee), section 559, that very slight circumstances are sufficient to authorize a court or jury to find the existence of a marriage. Manifestly the facts and circumstances above set forth are amply sufficient to sustain a finding of a marriage at common law in a civil action. [See Cargile v. Wood, 63 Mo. 501; Nelson v. Jones, 245 Mo. 579, 151 S. W. 80.]

We see nothing further in the case that merits discussion. The judgment should be affirmed. It is so ordered. *Reynolds, P. J.,* and *Allen, J.,* concur.